1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3 UNITED STATES OF AMERICA,      )  Case No. 2:19-cr-00133-APG-VCF
                                 )
4              Plaintiff,        )  Las Vegas, Nevada
                                 )  Wednesday, December 28, 2022
5         v.                     )  9:07 a.m. - 10:21 a.m.
                                 )  Courtroom 6C
6 MIRIAM SUAREZ-CONTRERAS,       )  IMPOSITION OF SENTENCE
                                 )
7              Defendant.        )  *C E R T I F I E D   C O P Y*
  _____ )

8

9

10          REPORTER'S TRANSCRIPT OF PROCEEDINGS

11          THE HONORABLE ANDREW P. GORDON
              UNITED STATES DISTRICT JUDGE

12

13

   APPEARANCES:  (See next page.)

14

15 REPORTED BY:  PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                 United States District Court
16               333 South Las Vegas Boulevard
                 Las Vegas, Nevada  89101
17

18

19

20

21

22

23

24 Proceedings reported by machine shorthand.
   Transcript produced by computer-aided transcription.
25

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  2

1   **APPEARANCES:**

2

3   For the government:

4           **MELANEE SMITH, AUSA**
            *UNITED STATES ATTORNEY'S OFFICE*
5           501 Las Vegas Boulevard, South
            Suite 1100
6           Las Vegas, NV 89101
            (702) 388-6068
7           E-mail: melanee.smith@usdoj.gov

8

    For Defendant Miriam Suarez-Contreras:
9
            **RICHARD E. TANASI, CJA**
10          *TANASI LAW OFFICES*
            8716 Spanish Ridge
11          Suite 105
            Las Vegas, NV 89148
12          (702) 906-2411
            E-mail: rtanasi@tanasilaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

1          LAS VEGAS, NEVADA; WEDNESDAY, DECEMBER 28, 2022; 9:07 A.M.

2                              --o0o--

3                     P R O C E E D I N G S

4               **COURTROOM ADMINISTRATOR:**  Do you solemnly swear that

5   you will well and truly interpret from the English language into

6   the Spanish language and vice versa according to the best of your

7   knowledge and ability, so help you God?

8               **THE INTERPRETER:**  I do.

9               **COURTROOM ADMINISTRATOR:**  Please state and spell your

10  name.

11              **THE INTERPRETER:**  Sure.  Judith Jenner, J-E-N-N-E-R,

12  federally certified Spanish court interpreter.

13              **COURTROOM ADMINISTRATOR:**  Thank you.

14         *(A recess was taken from 9:01 a.m. to 9:07 a.m.)*

15         *(All statements made by the defendant given through the use*

16         *of the Spanish interpreter, unless as otherwise indicated*

17         *"In English.")*

18              **COURTROOM ADMINISTRATOR:**  All rise.

19              **THE COURT:**  Thank you.  Please be seated.

20              **COURTROOM ADMINISTRATOR:**  United States vs. Miriam

21  Elizabeth Suarez-Contreras, 19-cr-00133-APG-VCF.  This is the

22  time set for imposition of sentence.

23              Counsel, please make your appearances.

24              **MS. SMITH:**  Good morning, Your Honor.  Melanee Smith

25  on behalf of the government.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  4

1              THE COURT:  Good morning.

2              MR. TANASI:  Good morning, Your Honor.  Richard

3  Tanasi for Miriam Suarez, who is present and in custody.

4              THE COURT:  Good morning to you, as well.

5              Good morning Ms. Suarez.

6              OFFICER CONOVER:  Good morning, Your Honor.  Tiffany

7  Conover with United States Probation.

8              THE COURT:  Good morning to you, as well.

9              Ms. Suarez-Contreras, do you go by Suarez?

10  Suarez-Contreras?  Contreras?  What's your preferred name?

11              THE DEFENDANT:  Suarez-Contreras.

12              THE COURT:  All right.  Good morning to you, ma'am.

13              On June 29th of this year, you pleaded guilty to the

14  charge of conspiracy to distribute a controlled substance,

15  specifically, methamphetamine.  Today is the hearing set to

16  impose sentence upon you for that crime.

17              Mr. Tanasi, you reviewed the presentence report,

18  correct?

19              MR. TANASI:  Yes, Your Honor.

20              THE COURT:  And discussed it with your client?

21              MR. TANASI:  Yes, Your Honor.

22              THE COURT:  Are there any factual errors or mistakes

23  we need to fix in the presentence report?

24              MR. TANASI:  There are no remaining factual errors or

25  mistakes.  The only two issues, Your Honor, that remain are, one,

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  5

1  the designation or the finding of leadership, the adjustment

2  there, and then the ramification related to the safety valve,

3  which we'll save for our arguments at sentencing.

4            And then, also, the reference to gang membership.

5  Ms. Suarez-Contreras does still adamantly dispute any -- any gang

6  affiliation or any gang membership.  And that's the important

7  thing to remove from the -- the report because it does follow her

8  into BOP and into designation, potentially, as well.  So those

9  are the only two factual --

10            THE COURT:  All right.  Thank you, Mr. Tanasi.

11            Ms. Suarez-Contreras, did you have a chance to read

12  the presentence report, or was it translated for you into

13  Spanish?

14            THE DEFENDANT:  Yes.

15            THE COURT:  Did you discuss it with your attorney?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Was Mr. Tanasi able to answer all of your

18  questions about that document?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Are you aware of any errors or mistakes

21  that need to be fixed in that report?

22            THE DEFENDANT:  No.

23            THE COURT:  There are some objections filed to the

24  presentence report.  Let's address those first.  These are

25  summarized on pages 34 through 36 of the presentence report.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  6

 1              Objection No. 1 is to whether Ms. Suarez-Contreras
 2    qualifies for the safety valve.  We'll hold off on that for a few
 3    minutes and come back to that.
 4              Objection No. 2 is the three-level addition under
 5    3B1.1(b).
 6              Again, my recollection is this is the safety valve
 7    issue, correct?
 8              **MR. TANASI:**  That's correct, Your Honor.
 9              **THE COURT:**  Yeah.  So we'll hold off on that, as
10    well.
11              Objection No. 3, looks like that's been resolved
12    because part C was updated to reflect that.
13              Is that correct, Mr. Tanasi?
14              **MR. TANASI:**  That's correct, Your Honor.
15              **THE COURT:**  All right.  So that's been resolved.
16              Objection No. 4 is the gang classification, at least
17    the -- the reference to reflect the defendant's -- well, let me
18    start over.
19              The objection is to the mention in the PSR to the
20    Sureno 13 Gang.  Officer Conover revised the PSR to add the
21    defendant's denial of that involvement.
22              Mr. Tanasi, is that sufficient to address your
23    concern?
24              **MR. TANASI:**  Your Honor, again, I would still submit
25    that there wasn't a gang-related charge in this particular case.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  7

1   She has not pled guilty to any gang-related charge in this

2   particular case.  It's a drug case.  And so, by preponderance of

3   the evidence, I would say that there's no factual connection that

4   states that Ms. Suarez-Contreras was a gang member, again, not

5   disputing her role in the drug conspiracy, disputing that she is,

6   in fact, a gang member.  And so, anything related to that has

7   really haunting effects on her as she travels through the BOP,

8   and so I think it's important to remove that.

9          If you look at subsection C, it says, Any information

10  that, if disclosed, might be -- or might result in physical -- or

11  harm to the defendant and others.

12         And so, again, having this allegation that she's

13  directly/indirectly affiliated with a gang, a gang member of some

14  kind, again, has very daunting consequences for her.  And so, I

15  think it's important to remove that entirely from the report.

16         **THE COURT:**  All right.  Ms. Smith, what's the

17  government's position on that?

18         **MS. SMITH:**  Your Honor, the government's position is

19  consistent with probation that it should stay in.  They have made

20  clear that Ms. Suarez-Contreras has denied any gang involvement.

21  She's never alleged by -- in the PSR to be a gang member herself,

22  merely that the drug trafficking organization had members of the

23  gang in it.

24         These are -- these are facts for -- you know, it

25  starts to get tricky when you start to omit facts.  And while I

1  understand that this may impact her potentially while in the

2  Bureau of Prisons, so could the fact that she was the leader of a

3  drug organization.

4          So I think that consistent with probation, the way

5  it's written that she -- she is never alleged by probation to

6  herself be a gang member.  It includes her denial.  So I think it

7  should remain the way it is.

8          **THE COURT:**  Officer Conover, anything further on that

9  point?

10         **OFFICER CONOVER:**  No, Your Honor.  Just as the

11  attorney has stated, it does not ever state in the paragraph that

12  she was, in fact, a gang member, just that through the

13  conspiracy, there was affiliation.

14         **THE COURT:**  Okay.  And I'm looking at paragraph 137

15  of the PSR.  It makes a reference, and it specifically states

16  that other individuals were believed to be members of the -- of

17  the Sureno 13 Gang.  And we've added the paragraph that she

18  denies any involvement, so I'm going to overrule that objection.

19         Objection No. 5 is to the finding in the PSR that no

20  factors under 3553(a) warrant a variance.  I'm going to leave

21  that for argument at the time of sentencing --

22         **MR. TANASI:**  Thank you, Your Honor.

23         **THE COURT:**  -- when we get to that.  So I'll overrule

24  that objection technically, but I'll allow you to argue that when

25  we get to the sentencing phase.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  9

1          **MR. TANASI:**  Understood.  Thank you.

2          **THE COURT:**  Okay.  That resolves the objections that

3  were previously made.

4          Are there any additional objections today?

5          **MS. SMITH:**  Not from the government, Your Honor.

6          **MR. TANASI:**  Not from the defense, Your Honor.  Thank

7  you.

8          **THE COURT:**  All right.  Thank you.

9          When I impose sentence, I have several things I have

10 to look at.  First, I'll look at the statute that Congress has

11 passed to determine what the maximum sentence is and whether

12 there's any mandatory minimum sentence that I have to impose.

13 Here, the relevant statute calls for a prison term of up to life,

14 and there's a mandatory minimum of ten years in prison that has

15 to be imposed, unless you qualify for the safety valve, which

16 we'll talk about a little bit later.

17         Under the statute, I have to impose a term of

18 supervised release of at least five years, and that can be up to

19 a lifetime of supervision.  I can impose a fine of up to $10

20 million, and I have to impose a special assessment of $100.

21         I then look at the sentencing guidelines that have

22 been adopted by the United States Sentencing Commission.  Those

23 guidelines are contained in a thick book that has a lot of

24 factors that I have to consider.

25         The guidelines are created to help judges like me

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  10

1  come up with an appropriate sentence.  They're also designed, in

2  part, to help judges sentence people across the country to

3  somewhat similar sentences if the circumstances are similar.

4         The guidelines recommend a sentence based upon two

5  main broad categories.  One is the nature of the crime you've

6  committed, and the second is your criminal history.  And there

7  are, like I said, many, many factors that come in under those two

8  broad categories.

9         Here, Officer Conover helped me calculate the offense

10  level.  The base offense level to start with is 36.  Two levels

11  were added because you involved a minor, a juvenile, in your

12  criminal activities.  Another two levels were added because you

13  were an organizer, leader, manager, or supervisor in the

14  organization, and then three levels were taken off because you

15  timely accepted responsibility.  That yields a total offense

16  level of 37.

17         Now, as Mr. Tanasi previewed, there are two issues

18  for calculating that offense level that the parties have reserved

19  to resolve today:  First, were you a manager or supervisor under

20  guideline section 3B1.1, and do you qualify for the safety valve?

21         Now, those, in a sense, are tied together because if

22  you're a manager or supervisor, then you don't qualify for the

23  safety valve.  I have read the defendant's memorandum, and I read

24  the government's that was filed.  I just got that this morning.

25  I have read that.

1          Mr. Tanasi, have you had a chance to review the
2    government's sentencing memorandum?
3          **MR. TANASI:**  I have, Your Honor.
4          **THE COURT:**  Okay.  You're prepared to go forward
5    today?
6          **MR. TANASI:**  Yes, Your Honor.
7          **THE COURT:**  All right.  So if either side has any
8    additional arguments you want me to consider beyond the papers,
9    go ahead.
10          Ms. Smith, you want go first.
11          **MS. SMITH:**  Yes.  Thank you, Your Honor.  And I
12    apologize for the late filing of that.  With the holidays, it got
13    a little tricky.
14          Your Honor, first I want to address the issue of
15    safety valve and whether or not Ms. Suarez-Contreras was an
16    organizer or supervisor.  In this case --
17          **THE COURT:**  And let's -- I'm sorry.  I did interrupt.
18          Let's limit it to that, and then we'll get to the
19    sentencing factors later.
20          **MS. SMITH:**  Oh.
21          **THE COURT:**  So first I want to get to the calculation
22    of the guideline range only, so focus on the safety valve and the
23    leadership role.
24          **MS. SMITH:**  Absolutely, Your Honor.
25          **THE COURT:**  Great.

1            **MS. SMITH:**  So in this case -- and I noted quite a

2  bit of this in the memorandum I submitted last night, but it's

3  the government's position that the defendant was both a

4  supervisor and qualifies under organizer.  What the case law

5  shows to be an organizer is actually quite a bit less than

6  supervisor, leader, or manager.  But I do believe she qualifies

7  under supervisor, just on the -- on the plain reading of what the

8  sentencing guidelines say is a supervisor, which is that the

9  defendant must have been the organizer, leader, manager, or

10  supervisor of one or more other participants.

11            Well, we know that she was.  We know that on several

12  dates at the beginning of the investigation, Barajas was sent to

13  deliver drugs.  People would call up the defendant, negotiate the

14  transaction, negotiate the prices.  There's times that during

15  calls that were intercepted where the -- the CS, the confidential

16  source, wanted to do the deal at a casino.  And the defendant

17  said, No.  I don't like it.  We're not doing it at a casino.

18  You're going to do it here.

19            And she would send them to a different location.  She

20  was very aware of sort of law enforcement, the potential of

21  getting caught, and then she would direct Barajas where to go,

22  how much to deliver, how much he was supposed to get paid.

23            At one point, when we're talking about the defendant

24  negotiated a transaction and sent the customer to the apartment

25  of Henderson and Mata, two co-defendants who have already pleaded

1  guilty and been sentenced, and while there, the customer wanted

2  four ounces.  It was -- the confidential source wanted four

3  ounces, but her runner had eight ounces and didn't know what to

4  do.

5              What do you do?

6              You call the boss.  They called the defendant, and

7  the defendant said, Well, cut it in half and then give him just

8  the four ounces.  Don't give him the whole thing.

9              Then, we move on.  And at one point, Barajas calls

10  the confidential source and says, Hey, one of her other runners

11  got picked up by the police.  We're worried.  But don't worry.

12  We have a replacement runner already in place.  This is going to

13  be the new runner.

14              So then, later, we have this juvenile, this

15  17-year-old kid or a kid under the age of 18 who, as I detailed

16  in my motion papers on at least eight different occasions, for

17  this defendant, delivered methamphetamine to customers.

18              And at one point, the confidential source told

19  this -- this juvenile, Hey, I want to order from you.

20              He said, No, no, no.  You have to call Ella.  You

21  have to call the defendant.  That's who does the deals.

22              She was supervising all of these runners.  She is

23  absolutely a supervisor.  But, under the case law, that's not

24  even the requirement.  And I first also want to address some of

25  the arguments that the defendant made in their memorandum that

1    she's not the supplier, so she can't be -- she can't qualify.

2    But then they also argue even if she was the supplier, the courts

3    say that's not enough.

4            Nobody's suggesting -- every person is supplied by

5    somebody, right?  The chain just keeps going up and up.  No one's

6    suggesting she's the head of the Sinaloa Cartel or that she's

7    running one of the clandestine labs in Mexico that creates all of

8    this meth.  Everybody is ultimately supplied by somebody.  She

9    was, of course, getting supplied by somebody, and in turn, she

10   was using these other people to distribute it while she was in

11   California, a very common hierarchy that we've seen.

12           But the Ninth Circuit has said you don't even need to

13   necessarily supervise other participants.  A defendant who has

14   the organizational authority necessary to coordinate the

15   activities of others to achieve a desired result is an organizer

16   for purposes of the enhancement under Section 3B1.1(c).

17           Well, we know she was the one coordinating and

18   organizing all the activities, right?  Somebody would call her

19   up, order a certain quantity of methamphetamine.  The defendant

20   would then dispatch a runner to a location directed by the

21   defendant, a time directed by the defendant, and would deliver

22   the drugs that were ordered from her.  She was organizing the

23   entire transaction.

24           And an enhancement may be proper, whereas here, a

25   defendant organizes the criminal activity even though he does not

1  retain a supervisory role over the other participants.  The

2  enhancement reflects greater level of culpability of the

3  participant who arranges the transaction.  That's exactly what's

4  happening here.

5          She is at the top of the indictment for a reason.

6  Every person who was arrested -- Henderson, Mata, Barnes,

7  Scarborough, Stumpf, all of them -- Oh, I called Ella.  Ella's

8  who gives me my drugs.  Everything goes through Ella.

9          Barnes said she's been going through Ella for the

10  past three years that this has been going on.  And all of them

11  said, Oh, yeah.  She uses this skinny kid to run for her on her

12  behalf.  Every person on -- that we've seen so far appeared in

13  this courtroom because of this defendant.  She is at the top for

14  a reason.  She is the one running the show.

15          This enhancement absolutely applies.  She is not

16  eligible for safety valve relief.  And I would ask that the Court

17  to find that the aggravating role applies and apply not only the

18  plus two, but disqualify this defendant from safety valve.

19          **THE COURT:**  Thank you, Ms. Smith.

20          Mr. Tanasi.

21          **MR. TANASI:**  Thank you, Your Honor.

22          Should approach the lectern?

23          **THE COURT:**  You can stay there.  If you got your

24  notes, there's fine.

25          **MR. TANASI:**  Thank you, Judge.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  16

1            **THE COURT:**  Just pull the microphone up so we get
2   your voice.

3            **MR. TANASI:**  Will do.  Thank you.

4            **THE COURT:**  Thank you.

5            **MR. TANASI:**  Briefly, Your Honor, and starting off
6   the argument relating to the organizer, leader, and safety valve
7   component --

8            **THE COURT:**  Yeah.  Let's limit it to that.

9            **MR. TANASI:**  Your Honor framed, sort of, where we're
10  at with the guidelines, and I wanted to, if the Court will allow,
11  just jump backwards for a second.

12           The parties do also all agree that there is a
13  two-level reduction for the group plea component of things which
14  takes us from a 37 to a 35.

15           **THE COURT:**  Actually, I was going to get to that,
16  because, Ms. Smith, there's two that I was going to get to a
17  little bit later.  But just so we're clear, in the plea agreement
18  at page 11 -- well, prior to that, there's the two-level group
19  plea.

20           There's also, in paragraph 19 of the plea agreement
21  at page 11, that if the offense level is 38 or higher, then the
22  attorney -- U.S. attorney will recommend a two-level downward
23  variance.  So if I don't find safety valve and it stays up at 38,
24  the government will still recommend an additional two-level
25  reduction.

1           I don't know if Mr. Schiff negotiated this one or not

2    and you inherited this case or whatever, but I didn't see that

3    mentioned in your brief.

4           **MS. SMITH:**  You're right.  A little bit -- it was a

5    little bit of both.  Yes, Your Honor.  So if it's 38 or higher

6    before operation of the acceptance for responsibility --

7           **THE COURT:**  Right.

8           **MS. SMITH:**  -- we will recommend a two-level downward

9    variance.  Part of the agreement was that there would be sort of

10   a cap on --

11          **THE COURT:**  Makes sense.

12          **MS. SMITH:**  Yeah.

13          **THE COURT:**  Okay.  Just so we're all on the same

14   page.  So I'm going to hold off on those issues until I make the

15   determination whether the -- whether the safety valve applies.

16   But yes, the group plea will certainly apply.  I just held off on

17   that, on the calculation first.

18          **MR. TANASI:**  Understood, Your Honor.  I apologize for

19   complicating --

20          **THE COURT:**  No.  I'm glad.  Let's be clear here.

21   Yeah.

22          **MR. TANASI:**  So turning, Your Honor, to the

23   organizer, leader, supervisor enhancement that the government's

24   seeking, I would submit that it doesn't apply in this case.

25   Starting with the guilty plea agreement and the terms under which

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  18

1   Miriam pled to, which was that she is a dispatcher in this case,

2   okay, dispatcher of -- of the drugs that were distributed, and

3   that, essentially, Your Honor, lands her as sort of a middle

4   woman in the organization, not a leader, not a supervisor, not an

5   organizational organizer.

6          Your Honor, I would turn your attention to just some

7   of the -- the cases that we cited in -- in our brief,

8   particularly, the ^  *Hoppe* case, which says, The government must

9   prove the defendant exercised some control over others in the

10  commission of the offense.  It's not enough that the defendant

11  was more culpable than others who participated in the crime.

12         And additionally, while defendant provides

13  significant amounts of drugs to the conspiracy, which there's no

14  dispute Miriam certainly did, her status or his status as a

15  supplier or distributor is already reflected in his base level

16  offense.  Status as a supplier or distributor without more is

17  insufficient to support a managerial enhancement in this case.

18         Your Honor, I would just urge the Court to go to the

19  very beginning of the investigation where the FBI was applying

20  for applications and for search warrants and in doing so, laid

21  out their view of the structure of -- of the organization.  As we

22  cited in -- in our brief, the -- one of the particular

23  applications, Exhibit E, all deliveries of the methamphetamine

24  were directed from an unknown person in Mexico.

25         I would submit, Your Honor, that that's our leader.

2:19-cr-00133-APG-VCF - Wednesday, December 28, 2022  19

```
 1   That's our organizer.  That's our supervisor.  That's not Miriam.

 2              Additionally, law enforcement reported that P.Z.

 3   said Primo is the narcotics supplier in Tijuana.  Primo advises

 4   Pineda and PZ when to expect delivery of their drug supply, then

 5   directs them where to deliver the drugs.

 6              Again, Your Honor, that's our leader, and that's our

 7   organizer.  That's our supervisor.

 8              Lastly, I would argue that at one point, the FBI

 9   actually identified Miriam as a low-level dealer.  In fact, the

10   application went on to say Miriam's supplier -- Miriam's supplier

11   is particularly important because without arresting suppliers,

12   other low-level dealers will simply fill the void left by the

13   arrest of a low-level conspirator.

14              And so, the government's words early on in the

15   investigation identified Miriam as a low-level individual.

16              Fast forward to where we are today, I understand the

17   government's not saying she's the leader of the cartel, but she

18   sits atop the indictment in this case.  And that's, again, by the

19   government's own design, not by Miriam's, and so that charging

20   document does not bind Your Honor in this determination today.

21              The facts that peel back underneath the case do, and

22   I think the facts demonstrate that in this case, Miriam was

23   simply nothing more than a middle person in the organization, not

24   a leader, not someone who should be enhanced in any way, and then

25   have that domino sort of fall where if she is enhanced as a
```

1   leader or organizer, she automatically is ineligible for the

2   safety valve, which I would submit that the parties agree all

3   other factors of the safety valve apply in this case except for

4   this one particular factor.

5           So with that, Your Honor, I'll submit it.

6           **THE COURT:**  Thank you.  Let me catch my notes up here

7   for a second, see if I have any questions for you.

8           **MR. TANASI:**  Sure.

9       *(Pause.)*

10          **THE COURT:**  Got the two that I was going to ask you.

11  Thank you.

12          **MR. TANASI:**  Thank you.

13      *(Pause.)*

14          **THE COURT:**  All right.  So, first, I'll note that in

15  the plea agreement, the parties agree to a two-level increase for

16  the use of a minor under Sentencing Guideline 2D1.1(b)(16)(B)(1).

17  That finding or that enhancement section begins by saying, If the

18  defendant receives an adjustment under 3B1.1.

19          So implicit in the two-level increase for the use of

20  a minor is defining that there's an adjustment under 3B1.1.

21          Regardless, the parties reserved the right to argue

22  this, so I'm not basing my decision upon that.  I just note

23  that's a bit of an interesting point in the sentencing -- in the

24  plea agreement.  Regardless, I'm making an independent

25  determination whether she qualifies for safety valve and whether

1   she's a leader under 3B1.1.

2           I do find that she was an organizer or supervisor.

3   She took orders.  She directed several different people to

4   fulfill them, made changes when there were changes in the sense

5   of the field or problems developed in the field, redirecting

6   where to go, cutting one of the deliveries in half, directing a

7   minor on at least seven or eight occasions to make deliveries for

8   her.

9           Under the language of 3B1.1, particularly at

10  Application Note 2, where she only had to supervise, organize, or

11  manage one or more participants, that's sufficient.

12          Theoretically, she could qualify for an even higher

13  aggravating role under 3B1.1(a) or (b), but the parties aren't

14  seeking that.  I'm not going to impose that.

15          I do, though, find that she is considered an

16  organizer or supervisor under 3B1.1, and therefore, the two-level

17  enhancement under 3B1.1 -- well, let's double-check this, now

18  that I think about it.

19          Yes.  I'm sorry.  Under paragraph 111 of the PSR,

20  there's a two-level enhancement under 3B1.1(c), so I do confirm

21  that.  I also find that she does not qualify for the safety valve

22  because of her leadership role.  And therefore, I affirm the

23  probation office's calculation of the total offense level up to

24  that point.

25          There are additional downward variances that the

1  parties have negotiated.  We'll talk about those in a few

2  minutes.

3          All right.  Officer Conover calculated you as having

4  zero criminal history points.  That puts you in Criminal History

5  Category 1 under the sentencing guidelines.  And so, with a total

6  offense level of 37 and a criminal history category of 1, the

7  guidelines recommend a prison sentence of 210 to 262 months in

8  custody and five years of supervised release and a fine in the

9  range of 40,000 to 10 million dollars.

10          I will impose the two-level downward variance for the

11  group plea, and I'm inclined to follow the plea agreement's

12  recommendation of an additional two-level at the government's

13  suggestion.  We'll get to those again in a few minutes, but that

14  would further reduce the guideline range.

15          As I mentioned at the beginning, I consider the

16  statute that Congress has passed.  I look at the sentencing

17  guidelines.  And there's another set of factors I have to

18  consider under 18 U.S.C. section 3553(a).  We'll address that in

19  a minute.

20          First, just let me hear if either side has anything

21  additional to add under their sentencing -- or in addition to

22  their sentencing memoranda.  I'll note for the record I have

23  reviewed the presentence report, the charging document, the plea

24  agreement, both sides' memoranda, and the many, many letters of

25  support that were offered and the certificates of completion of

1    coursework at Nevada Southern Detention Center.  But, if either

2    side has additional comments, now is the time.

3              Ms. Smith.

4              **MS. SMITH:**  Thank you, Your Honor.  Your Honor,

5    whenever we come into court, particularly, this court on a case

6    such as this, where there's a drug conspiracy involved, the

7    question we always first ask is, what was this defendant's role

8    in the conspiracy?

9              I think we've established within this conspiracy her

10   role was that she was at the tip of the spear.  She was the one

11   running the show.

12             And when I read through the PSR and the defendant's

13   sentencing memorandum, which I've read several times, the very

14   first thing that struck me and the thing that I'm still struck

15   by, there is not an ounce of contrition in either.

16             When the defendant had the opportunity to give her

17   side to probation, she never acknowledges her -- her conduct or

18   the impact it's had on the community or apologizes.  The farthest

19   it goes -- usually, in a defendant's sentencing memorandum, it's

20   almost overcompensating with how sorry they are, and, you know,

21   I'll never do it again.  We don't see that here at all.  The

22   farthest it goes is the defendant has respect for the law.  In

23   fact, there was one paragraph where that was used twice.

24             But it never says she understands the impact.  And

25   the reason this is important is throughout this conspiracy, she

1   was using a child.  She introduced a child into criminal conduct,

2   and at the time that that was happening, her son would have been

3   the same age as the child she was using to deliver drugs.

4           So when I look at all of these letters about how much

5   she loves her children and the community -- and I don't doubt

6   that that's true, but what strikes me is that she is using a

7   child the same age as her own son, introducing them to this

8   criminal element, this dealing drugs.

9           And as we know, the drug trade is inherently

10  dangerous.  There were at least two occasions in this

11  investigation where somebody showed up with a gun to a drug

12  transaction.

13          So we're sending -- she's sending a child into that

14  environment.  She -- this juvenile delivered drugs to Brian

15  Scarborough, who right afterwards was found to have a gun.  She's

16  putting him not only in -- introducing him to crime, but sending

17  him into inherently dangerous situations where he could be hurt

18  or killed, a child the same age as her son.

19          There's no addressing this why she engaged in this

20  conduct.  Renea Barnes, when she was arrested, said, Oh, yeah.

21  I've been going to Ella for like three years.

22          In this case, the defendant admitted that at least

23  4.6 kilograms was foreseeable to her in this conspiracy.  Well,

24  that's just during the course of this investigation.  If she's

25  been doing this for three years, that number is exponentially

1  larger.  But just taking that number, 4.6 kilograms, the average

2  user buys quantities of an eighth of an ounce, an 8-ball, or a

3  16th of an ounce, which is a teener.

4              Taking the larger amount, the eighth of an ounce,

5  just for -- that's over 1300 separate little baggies of

6  methamphetamine.  If you take it and break it down to a 16th of

7  an ounce, it's double that.  And that's just in the few months

8  she was being investigated.  That doesn't take into account all

9  of the drugs we don't know about.

10             And yet, there's not a single I'm sorry for the

11 impact I've had on the community.  And what strikes me more, in

12 the PSR, she says that her own father was addicted to alcohol and

13 drugs, and that caused a lot of instability.  And yet, here she

14 is putting this into all of these other families, contributing to

15 this misery in all of these other families.

16             And I want to touch on that issue with her father

17 that, you know, in the PSR and in her own sentencing memorandum,

18 that it was her father who created this instability and all of

19 these things.  And yet, in the letter written by her aunt,

20 Alejandra Contreras-Moreno, she was very sad because she was not

21 able to see and say farewell to her dying father who she so

22 loved, who was her moral and her strength.  In another letter

23 submitted, it says she was very attached to her dad.

24             And so, I'm -- it's a little incongruous with the PSR

25 and the defendant's own argument that it was part of why she kind

1    of has had this horrible life and ended up where she is, is

2    because of her father.  Yet according to her own relatives, her

3    and her father were incredibly close.  He was her moral strength.

4    So I -- I'm just -- there's an incongruity there that has not

5    been addressed.

6              She told probation she doesn't suffer from mental

7    health issues.  She has no substance abuse issues.  She's

8    clear-minded.  She's making these choices.

9              I also was a little caught off guard by one of the

10   arguments in the defense that there's sort of this duress issue.

11   We've been negotiating this case for years.  Never once has there

12   been this mention of duress, she was pressured, and there's just

13   one paragraph asking the Court to take this into account when

14   determining the appropriate sentence that she felt pressured from

15   dangerous people to start and maintain her work in the

16   conspiracy.  There's no context.  There's no further explanation.

17   But then it asks the Court to take that into account and give her

18   a lesser sentence as a result.

19             And so, beyond that, there's absolutely no

20   explanation for her offense conduct in this case, for why she was

21   putting all of these drugs out in the community.  And the reason

22   we go back to the role and the reason there is a mandatory

23   minimum for certain people but not for others is because of the

24   impact that it ultimately has on the community.

25             This runner might impact this handful of people he

1  delivers to; this runner, this handful of people; but the

2  defendant at the top, she's impacting all of those people in this

3  case, potentially thousands.  And that's what the problem is.

4  And that's why we are asking for the sentence that we're asking

5  for.

6        So in addition to all of the arguments contained in

7  my sentencing memorandum and what I said today, I do believe

8  there is a discrepancy in the sentencing memorandum that I

9  submitted in that I based my recommendation on a total offense

10  level of 35.  The government did agree to recommend an additional

11  two levels, which would be 33.

12        With a criminal history category of 1, that is a

13  135-month sentence, which really isn't that much more than the

14  bare minimum she can get, which is 120 months.

15        I do think five years of supervised release is

16  appropriate in this case.  I think this is somebody who needs to

17  be supervised.

18        Not asking for a fine.  That doesn't seem appropriate

19  here.

20        So, Your Honor, with that, I'll submit.

21        **THE COURT:**  Thank you, Ms. Smith.

22    *(Pause.)*

23        **THE COURT:**  Mr. Tanasi, thank you for your patience.

24        **MR. TANASI:**  Thank you, Your Honor.

25        May I proceed?

1          **THE COURT:**  Yes, please.

2          **MR. TANASI:**  First I'd just like to address the lack

3    of contrition at issue.  I would say that in my 17, almost 18

4    years of doing this, I routinely advise my clients not to talk

5    about the offense in the presentence interview.  We reserve that

6    for Your Honor.  And today, my client would like to address the

7    Court after I have a chance to go.  And she will be expressing

8    her contrition.

9          I will say that I normally don't do this, and that's

10   interject, sort of, my personal vouching for a client.  The four

11   years that I've gotten to know Miriam -- and it's been four years

12   -- I can say she's one of the most genuinely sweet, kind, caring

13   individuals that I've had the pleasure of representing.  And I go

14   one step further to say that I've witnessed the tears of her

15   contrition over those four years.

16         Her family is here to show that support and to be

17   behind her, and she is devastated about what her choices and her

18   decisions have caused and what her choices and her decisions have

19   propelled her family to all come here from out of state to

20   support her and the impact that her decisions have caused and in

21   detriment to society.  She knows that full well.

22         I would also say that the argument that there's some

23   sort of incongruent argument that her father -- or there was

24   issues that she had in being raised and abuse that she might have

25   suffered, you may note that our -- our sentencing memorandum was

1  filed under seal, in part, because some of that stuff is pretty

2  personal to her and not necessarily known to the entire family,

3  we'll say, all of the details.

4          I will also say that a cycle of abuse is just that.

5  A cycle of abuse in a mitigation context causes instability.  So

6  in other words, instability breeds instability.  That's exactly

7  what we have here.

8          And so, while there may be sort of this appearance of

9  a stable-minded, calculated individual, I would submit that

10 Miriam suffered a whole lot of tragedy and a whole lot of abuse

11 and have -- has been in a whole lot of unstable situations, which

12 caused her to make poor, unstable decisions, which also leads

13 into the duress argument we presented.

14         And yes, that was not negotiated in this particular

15 case.  I will point out for the record that prior to Ms. Smith's

16 involvement in the case, there was another prosecutor in the

17 case.  And in that setting, there were discussions about

18 potential cooperation.

19         However, out of sheer fear at its most primal core

20 for folks that live back in Mexico that she was never going to

21 say a single word about and still has not said a single word

22 about, we couldn't necessarily advance a meaningful duress

23 argument, nor could we advance any cooperation in this case, and

24 that's why we're not asking for anything related to substantial

25 assistance or anything along those lines because of the inherent

1  fear that, quite frankly, very few of us in this courtroom could

2  ever really understand.

3           I will point out, as Your Honor did mention, there

4  are several letters of support for Miriam.  30-plus, I think, is

5  the number I end on with certifications of things that Miriam has

6  done while in confinement to try to better herself and try to be

7  productive.

8           Again, I have plenty clients who don't necessarily

9  act productively and do things in a way that tries to help

10  themselves or help their situation.  Oftentimes I'm arguing

11  before the Court to not really factor all of the alleged

12  incidents that are in the pre- -- presentence report that came

13  out of their conduct while they were in custody for four years.

14           I don't have to do that in this case because Miriam

15  instead took that opportunity to try to better herself over the

16  course of four years.  And not only that, work.  Again, I don't

17  have a whole lot of clients who spend time actively working, you

18  know, as a porter, cooking, cleaning, doing things to just try

19  and be as productive as she can.

20           Doesn't have to minimize her role in the offense.  I

21  would submit to Your Honor that the -- the mandatory minimum of

22  120 years -- 120 months is appropriate.  I think that the statute

23  and the mandatory minimum contemplates the appropriate sentence.

24           The guidelines, I do understand the role adjustments,

25  and I do respect the Court's position.  I still respectfully

1   disagree, but I respect the Court's decision there.

2          And I will say that the guidelines follow the Court's

3   decision, and that particular case shouldn't necessarily drive

4   ultimately what the Court's decision is.  The 355- -- 3553

5   factors in this case, I think, Your Honor, can lead the Court to

6   a finding of 120 months, the mandatory minimum.

7          Again, pointing out the character, which we talked

8   about at length, the abuse, and the issues that she suffered

9   growing up, the nature and circumstances of the offense, I think

10  it's important to note that there was no violence at all that

11  surrounded Miriam particularly.  I do understand the violent

12  secondary implicit nature of drug dealing.  I'm not minimizing

13  that in any way and neither is Miriam.  But there's no violence

14  that's tied to Miriam in any way in this case.

15         She does respect the law, Your Honor.  43 months

16  without seeing her family has been devastating.  Showing some of

17  that respect or proof of some of that respect, Your Honor, I

18  would point out that she was second among the group plea

19  defendants to enter her group plea in this case.  I know she

20  wasn't the first defendant to plea.  I'm not making that

21  argument.  But she was second among the group of folks to enter a

22  plea in this case.

23         Your Honor, I think that the -- the request for 120

24  months would also avoid sentencing disparities in this case.

25  Four of the five defendants that Your Honor has sentenced already

1  received sentences of 48 months or 43 months.  One of them

2  received a sentence of 90 months.

3          Your Honor, if the Court views Miriam as the leader

4  of this group, which again, I respect the Court's decision there,

5  adding from the difference of 90 to 120 months, adding 30 months

6  I think would be the appropriate designation in this case.

7          Lastly, Your Honor, I'll submit that, again, adding

8  personal touches that I normally don't do, my client sends me a

9  Christmas card and wishing me well wishes for my family, right,

10 while she's in pretrial confinement, knowing that she has a large

11 sentence ahead of her, knowing that Your Honor could decide just

12 as Your Honor decided today, which was that she was a leader and

13 she wasn't going to get the safety valve, knowing that.  That's

14 somebody who respects the law.

15         She respects the situation she's in, which she's put

16 herself in.  120 months is the appropriate and just sentence in

17 this case, Your Honor.

18         **THE COURT:**  Ms. Suarez-Contreras, you're entitled to

19 speak during this proceeding if you'd like.  You don't have to.

20 But if there's anything you'd like to say, now is the time.

21         You can remain seated and be comfortable.  Just make

22 sure you -- let's have her tell the translator, then -- yeah.

23 That way, we'll get the English translation on the microphone.

24         **THE DEFENDANT:**  Dear Judge, first of all, good

25 morning.  With all due respect to Ms. Melanee Smith, the fact

1  that my father was an alcoholic or used drugs doesn't mean that I

2  have -- do not have good communication, respect, and love for

3  him.

4          I don't know if what my dad did dragged me down or

5  not.  And he also did not lead me down a bad path.  Whatever his

6  vices may have been, he did teach me values.

7          I just want her to know my father is deceased, and it

8  hurts me that she says something negative about him or about me.

9  And that is it.

10          I'd like to say something to Your Honor.

11          **THE COURT:**  Please.

12          **THE DEFENDANT:**  My name is Miriam Elizabeth

13  Suarez-Contreras.  I'm 43 years old.  I've got three children.  I

14  am a single mother.

15          I'd like to ask for forgiveness from the United

16  States of America.  I know that I made a mistake.  There's no

17  doubt that this has been the biggest mistake of my life, and I'm

18  here paying for it.  I am accepting that I am guilty.

19          In these 43 months that I've been in the detention

20  center, I've realized the impact that people have, people who use

21  drugs.  And I'd like to ask for forgiveness for all those people

22  that I've hurt.  I didn't only just do it to them.  Also the

23  children and to those children's families.

24          I know that being under the influence of drugs has a

25  very significant impact because I see -- I see my -- my

1  colleagues.  So many of them have lost their children.  Thank God
2  I still have my children.  And it's for them and for this country
3  that I am remorseful because I let them down, because I'm a woman
4  who has so many faults.
5            I'd like to ask you to please give me the
6  opportunity, of course, if you'd like.  I know that I'm in your
7  hands.  And whatever it is that you decide, either way, thank you
8  so much for your attention, for your time.
9            **THE COURT:**  You're welcome.  Thank you.
10           Officer Conover, does probation have anything to add?
11           **OFFICER CONOVER:**  No, Your Honor.
12           **MR. TANASI:**  Your Honor, I apologize.  If I may, we
13  have two speakers contemplated for today.
14           Is that okay if --
15           **THE COURT:**  Absolutely.
16           **MR. TANASI:**  -- we call them now --
17           **THE COURT:**  Absolutely.  Have them come forward to
18  the microphone there in the back.
19           **MR. TANASI:**  Thank you.
20           **THE COURT:**  Hi.  Good morning.  If you would just
21  state and spell your name slowly into the microphone there so we
22  get it correct in the record, please.
23           **MS. M. SUAREZ:**  Okay.  Hi, good morning, Your Honor.
24  My name is Miriam, M-I-R-I-A-M, Geovanna, G-E-O-V-A-N-N-A,
25  Suarez, S-U-A-R-E-Z.

1              **THE COURT:**  Good morning.

2              **MS. M. SUAREZ:**  Good morning.  I am Miriam's oldest

3     daughter.  I'm sorry.

4              **THE COURT:**  Take your time.  I know this is

5     difficult.

6              **MS. M. SUAREZ:**  I was -- I was prepared, but I fell

7     through now.  I'm so sorry.

8              I'm here today to speak to you about my mom.  My mom

9     is one of the sweetest, kindest person you will ever meet.  I'm

10    not only saying that because she's my mom, but if you ask anybody

11    in this room, her friends inside the detention center, they will

12    tell you that she is a kind person.

13             When my mom left -- before my mom left, all the

14    family used to always be connected.  We were always in family

15    gatherings, and we were always happy and came.  The day she left,

16    our whole family fell apart.  Everybody started talking to

17    everybody.  Everything just fell apart.

18             But I at least tried to keep my brothers together

19    because I always saw her, that even after everything she went

20    through, her and her brothers always stayed together and

21    connected.  So me, as the oldest, I tried always to be with my

22    brothers and protect my brothers.

23             Before I became a mother, I didn't know what love was

24    and what family really meant.  I was a teenager then.  Didn't

25    really care.  I was just living my life as day as day.

1          The day I became a mom, me and my mom created a bond

2    that no one, nobody, could ever break.  My brothers and I went

3    through so much the day she left.  There was a tragedy that

4    happened.  We never spoke about it because we were scared because

5    we were alone.  Yes, we had family, but it didn't feel right to

6    tell because they're not our mom, right?  Like she said, she's a

7    single mom.  We always been just us four.

8          It hurts me that she's not here to see my kids grow

9    up.  And I know it hurts my son.  He's a five-year-old, but as

10   soon as he seen -- she left when he was one.  As soon as he saw

11   his grandma, he started tearing up.  And I don't know how does he

12   know and how does it affect him as being a five-year-old.  He

13   knows.  And it hurts him, and it also caught me.  I see him

14   tearing up as he saw his grandma.

15          I have three kids.  I have a five-year-old, a

16   three-year-old, and a one-year-old.  She doesn't know.  She's

17   never met the three-year-old or the one-year-old.  She's only met

18   them through FaceTime when she calls us.

19          When my mom left, she was the -- before my mom left,

20   she was the one that would always cook for us.  If I wanted a

21   meal, she'll make me a meal.  If my brother wanted something,

22   she'll make something.  Sometimes she'll make three different

23   meals because I'm really picky.  I don't like a lot of stuff.

24          And let me tell you, I didn't even know how to boil

25   beans.  I didn't know how to make an egg, and I was 19 years old.

1   I know that's really funny, but I didn't know how to boil eggs.

2   I would wait for her calls all the time to ask her, How do you

3   boil eggs?  How do you do this? so I could cook for my boyfriend,

4   my son, and my two brothers.

5           Sometimes I would burn the easiest food, and my

6   brothers would still manage to tell me they were good, even

7   though deep down they knew they were lying to me.

8           She taught me so many things through the phone.  I

9   would wait for her calls all the time before it was time for my

10  brother and my boyfriend to come home so I could cook a meal

11  because I didn't know how to do anything.

12          I learned so many when she left because you always

13  think that everyone is there for you and everything.  In reality,

14  there isn't.  You never know how much you love a person or how

15  much you need a person until they're not here anymore.

16          And I think and I believe that my mom should be out

17  because we really need her a lot.  I never -- you can ask her.  I

18  never told her I love you before, when she was with us.  I would

19  never hug her because I thought I was cringe to me.  I am so

20  sorry, but it's just the truth.  I just thought it was cringe to

21  hug my mom or tell her I love you.  I would always see my friends

22  tell their moms I love you or hug them, and I wouldn't.

23          The day my mom left, for the past four years, I

24  think, three about to be four, every time she calls, I always

25  tell her I love you.  And now I really wish I could just give her

1    one hug.

2                Thank you, Your Honor.

3                **THE COURT:**  Thank you for coming forward.  I know

4    it's not easy.

5                **MR. TANASI:**  Thank you, Your Honor.

6                Francisco.

7                **THE COURT:**  Good morning.  If you would state and

8    spell your name for the record, please.

9                **MR. F. SUAREZ:**  Francisco Suarez.

10               **THE COURT:**  Let's pull the microphone up closer to

11   our translator.

12               **MR. F. SUAREZ:**  Francisco Suarez.

13               **THE COURT:**  Thank you.

14               **MR. F. SUAREZ:**  Good morning.

15               **THE COURT:**  Good morning.

16               **MR. F. SUAREZ:**  I'd like to tell you, whatever it is

17   that you decide, I think it will -- it will be the just decision.

18   I'd also like to let you know that her family needs her because

19   she's very important for us.  And whatever -- whatever it is that

20   you decide will be the best thing.

21               I do not wish to waste your time and that's all.

22               **THE COURT:**  It's not a waste of time.  Thank you for

23   coming forward.  I know it's not easy.

24               **MR. F. SUAREZ:**  Okay.  That's all.

25               **THE COURT:**  Thank you.

1          Anyone else, Mr. Tanasi?

2          **MR. TANASI:**  No, Your Honor.  Thank you.

3     *(Pause.)*

4          **THE COURT:**  As I mentioned earlier, after I look at

5     the statute and the sentencing guidelines, I look at another

6     statute known as 18 U.S.C. section 3553(a).  That statute

7     requires me to consider the nature and circumstances of the crime

8     you've committed and your personal history and characteristics.

9          That statute also tells me that I have to impose a

10    sentence that tries to do a number of things.  That sentence has

11    to reflect how serious this crime is.  It has to promote respect

12    for the law and provide just and appropriate punishment.  My

13    sentence has to deter you and others from committing these crimes

14    in the future.  I need to protect the public from future crimes

15    you may be committing.  I need to provide education, training,

16    counseling, things to help you reintegrate back into society.

17    And I need to avoid sentencing disparities.  That means I need to

18    take into account sentences imposed on others similarly-situated

19    defendants.  So there are a lot of factors I have to consider

20    under that statute.

21          With regard to the crime you've committed, it is a

22    very serious one.  Methamphetamine is having a terrible impact on

23    our community.  People are dying or ruining their lives from this

24    poison.  If your kids had gotten ahold of this methamphetamine

25    and died, overdosed, or ruined their lives by becoming addicted,

1    maybe you would have thought twice about what you were doing.

2    But other people's kids are dying from this stuff.  Other

3    people's wives and husbands are dying or ruining their lives.

4    And you were helping spread this poison in our community for

5    several years and a large amount of it.  That has a huge impact

6    on our society.  And so, a lengthy custodial sentence is

7    appropriate.

8              And as Ms. Smith points out, to involve a juvenile, a

9    minor, in these activities makes it even worse.  The guideline

10   range accounts for that with a two-level adjustment.

11             This obviously was not your first time committing

12   this crime because you were able to access large amounts of this

13   poison and supply it to your customers over a long period of

14   time.  Customers knew to call you directly for methamphetamine.

15   That just doesn't happen overnight.  There has to be some kind of

16   trade, some kind of pattern established so people know who to

17   call.

18             You had to have developed a relationship with

19   suppliers above you in the chain to know who to call to get this

20   drug transported here to Las Vegas.  So you had to have developed

21   a relationship above you and below you in this chain over a

22   period of time.

23             I agree, you were not the king pin of this drug

24   cartel, but you were significantly involved in a high level for a

25   long period of time.

1            I don't know why you got involved in this.  You have
2      good family support.  You're raising good children and raised
3      good children.  And oftentimes, with crimes, that's the
4      collateral damage we see; that the families get punished, in a
5      sense, because the defendant is taken away from them for a while.
6      And that's a shame, but that's the risk that someone undertakes
7      when they commit these crimes.
8            I'm glad you're staying active while you're in
9      custody and taking courses and trying to improve yourself.  I
10     hope you will also stay in communication with your family and
11     teach them not to follow the path you took, teach them that bad
12     acts lead to bad consequences.  And you're a living example of
13     that.
14            But you can also teach them there's such a thing as
15     rehabilitation and that just because you find yourself going down
16     a bad path doesn't mean you have to continue to do that and that
17     you can change course no matter how tough it seems and not expose
18     yourself to this kind of problem.  So I hope you will teach your
19     children and grandchildren that, because at some point, you will
20     come out of custody, and you will still be a young woman.  You
21     may not feel like it, but you still have a long life ahead of you
22     if you can get yourself together and get a job and stay in
23     contact with your family.
24            The parties have negotiated a two-level downward
25     variance for a group plea.  I will honor that.  I will also honor

1   the government's two-level downward variance in the plea

2   agreement.  That takes the total offense level to 33.

3           So the guideline range, as Ms. Smith points out, is

4   135 to 168 months in custody.

5           There still is a mandatory minimum of 120 months in

6   custody.  I can do nothing about that.  Congress has required

7   that someone convicted of this crime must serve at least ten

8   years in prison.  I cannot do anything about that.

9           And I have no control over the deportation decision.

10  That's not my jurisdiction, either.  I don't know if you will be

11  deported.  In all fairness, it's probable that you will be.  And

12  I take that into account in determining sentence, in part,

13  because you will have difficulties that American citizens would

14  not in that sense.

15          I have also repeatedly held that the sentencing

16  guidelines for this crime are very high and bear no relationship

17  often to the facts or the defendant's true culpability.  The

18  guideline ranges are not based on empirical evidence, and so I

19  often vary downward to ensure that the sentence in a particular

20  case is based upon a thoughtful application of the 3553(a)

21  factors instead of an artificial congressional decision that

22  results in a huge sentence that may not apply.

23          But I also recognize in this case that we're dealing

24  with a significant amount of methamphetamine and a defendant who

25  is involved in this conspiracy for a long period of time.  So a

1  lengthy custodial sentence is necessary based on the 3553(a)

2  factors to deter this conduct and to sufficiently punish the

3  defendant for her actions and also to recognize the seriousness

4  and detrimental impact on the community that's caused by all

5  this.

6          After considering the 3553(a) factors, I do find that

7  this remains in the heart line -- heartland of the guidelines,

8  and I don't see a basis for a downward variance under 3553(a).

9          So I will impose a sentence of 135 months in custody.

10  A mandatory penalty assessment of $100 is due immediately.  I

11  will not impose a fine.  I will impose a term of five years of

12  supervised release.

13          Mr. Tanasi, on pages 32 and 33 of the presentence

14  report are recommended conditions of supervision.

15          Do you have any objections to those?

16          **MR. TANASI:**  Your Honor, no objections.  I will

17  submit, though, the Court doesn't necessarily have to impose

18  supervised release, a term of supervised release in this case.

19  The guidelines, I think, if you contemplate that since she is not

20  a U.S. citizen, 5D1.1 does say the court ordinarily impose a term

21  of supervised release in a case in which supervised release is

22  not required by statute --

23          *(Whereupon, the reporter interrupts to preserve the*

24          *record.)*

25          **THE COURT:**  Yup.  Slow down.

1          **MR. TANASI:**  I apologize, I apologize.  -- and the

2   defendant is a deportable alien who likely will be deported after

3   imprisonment.

4          **THE COURT:**  My recollection is that supervision is

5   required under the statute.

6          **MR. TANASI:**  You are 100 percent correct, Your Honor,

7   and I apologize for wasting the court's time on that.

8          **THE COURT:**  That's all right.  No, no, no.  It's good

9   to ask.  And let's make sure of that.

10          I do have -- I have to impose a mandatory minimum of

11   five years of supervised release; is that correct,

12   Officer Conover?

13          **OFFICER CONOVER:**  Yes, Your Honor.  Per statute.

14          **THE COURT:**  Per statute, yes.

15          **MR. TANASI:**  Per statute, Your Honor.  I apologize.

16          **THE COURT:**  That's all right.  No.  No worries.

17          Any objections to the conditions set forth on 32 and

18   33 of the PSR?

19          **MR. TANASI:**  No, Your Honor.

20          **THE COURT:**  All right.  Any objections to those,

21   Ms. Smith?

22          **MS. SMITH:**  No, Your Honor.

23          **THE COURT:**  I will impose the standard and mandatory

24   conditions recommended by the sentencing commission and the

25   special conditions recommended on pages 32 and 33 of the

1  presentence report.  I'll summarize those for you so you

2  understand them.

3          You must not have any contact or otherwise interact

4  with your co-defendants in this case, either directly or through

5  someone else, without first obtaining the permission of the

6  probation office.  You'll be subject to a search and seizure

7  requirement.

8          I'm sorry.  Go ahead and chat.

9      *(Counsel and defendant conferring.)*

10          **THE COURT:**  You'll be subject to search and seizure

11  requirement of your person, property, house, residence, vehicle,

12  papers, computers, and other electronic devices.  The search can

13  be conducted by a probation officer based upon a reasonable

14  suspicion that the area to be searched will reveal evidence of a

15  violation.  The search will be conducted at a reasonable time and

16  in a reasonable manner.

17          And finally, if you are ordered deported, you must

18  remain outside the United States unless legally authorized to

19  reenter.  If you reenter the United States, you must report to

20  the nearest probation office within 72 hours.

21          Officer Conover, do you have a copy of those

22  conditions in Spanish for our defendant?

23          **OFFICER CONOVER:**  Yes.  I have them in Spanish and

24  English.

25          **THE COURT:**  Thank you.

1          **OFFICER CONOVER:**  Before I give them to the

2  defendant, I have recommended that the drug testing not be

3  applied in this case due to her lack of drug use.  I just wanted

4  to make sure that the Court was going with that --

5          **THE COURT:**  Thank you for that clarification.  Yes.

6  I will exclude or excuse the defendant from the drug testing

7  condition because there is no evidence she has been tested

8  positive.  Thank you for that clarification.

9          I find all of these conditions are reasonably related

10  to the goals of deterrence, protection of the public, and the

11  defendant's rehabilitation, and they involve no greater

12  deprivation of liberty than is reasonably necessary to achieve

13  those goals.

14          Ms. Suarez-Contreras, can you please acknowledge on

15  the record that you've been given a copy of those conditions in

16  English and Spanish.

17          **THE DEFENDANT:**  Yes.

18          **THE COURT:**  I need to advise you that if you violate

19  those conditions, I can revoke your supervised release, and you

20  can be sent back to prison, potentially for up to the full amount

21  of time of supervised release and potentially without any credit

22  for time served on supervised release.

23          One of those conditions is if you are deported, you

24  cannot return without permission from the United States

25  government.  I know there's a strong attraction to come back

```
 1  because you have family here.  Please have them come visit you in
 2  Mexico if you're deported.  It's better to visit them in person
 3  and to hug them in Mexico than it would be to visit them in
 4  prison here in the United States.
 5          As I said earlier, I have no control over the
 6  deportation process or proceeding.  I have no jurisdiction over
 7  that.  That's a different judge's decision in that regard.
 8          But please don't violate those conditions because
 9  that will be a violation of conditions that I can send you back
10  to prison for.  And if you come back illegally, that would be a
11  new crime that could further increase the prison sentence for
12  that case.
13          I also need to remind you that in your plea
14  agreement, you waive most of your rights of appeal.  You have
15  some very limited rights you still have to appeal your conviction
16  and sentence.
17          Speak to Mr. Tanasi right away so you can make an
18  informed decision.  You have 14 days from the entry of judgment
19  in which to file a notice of appeal.  If you can't afford an
20  attorney for the appeal, one will be appointed at the
21  government's expense.  If you can't afford a copy of the
22  transcript for the appeal, that, too, will be prepared at the
23  government's expense.
24          But speak to Mr. Tanasi right away so you can make an
25  informed decision.
```

1           Mr. Tanasi, does your client have a preferred
2    facility to be designated to serve her time?
3           **MR. TANASI:**  Yes, Your Honor.  Dublin.
4           **THE COURT:**  I'll recommend Dublin based on proximity
5    of family.
6           **MR. TANASI:**  Thank you, Your Honor.
7           **THE COURT:**  You're welcome.
8           Ms. Smith, is the government moving to dismiss the
9    other charges against this defendant?
10          **MS. SMITH:**  Yes.  I believe there are 16 additional
11   counts, and the government moves to dismiss those at this time.
12          **THE COURT:**  All the other counts against the
13   defendant -- I believe there are 16 -- are hereby dismissed --
14   charges against the defendant in this case are hereby dismissed.
15          Anything else I can do for the parties?
16          **MS. SMITH:**  Not for the government, Your Honor.
17          **MR. TANASI:**  Not for defense.  Thank you, Your Honor.
18          **OFFICER CONOVER:**  No, Your Honor.
19          **THE COURT:**  All right.  The defendant is remanded to
20   the marshals custody.  We're in recess on this matter.  Thank you
21   all.
22          **MR. TANASI:**  Thank you.
23          **MS. SMITH:**  Thank you, Judge.
24          **COURTROOM ADMINISTRATOR:**  All rise.
25              (*Proceedings adjourned at 10:21 a.m.*)

1                          --o0o--

2                COURT REPORTER'S CERTIFICATE

3       I, Paige M. Christian, Official Court Reporter, United

4  States District Court, District of Nevada, Las Vegas, Nevada, do

5  certify that pursuant to 28 U.S.C. § 753, the foregoing is a

6  true, complete, and correct transcript of the proceedings had in

7  connection with the above-entitled matter.

8

9  DATED:  February 11, 2023

10

11                      /s/ Paige M. Christian_____
                        Paige M. Christian, RPR, CRR, CCR #955
12                      Official Court Reporter
                        United States District Court
13                      District of Nevada

14

15

16

17

18

19

20

21

22

23

24

25